1  TOMIO B. NARITA (SBN 156576)
   tnarita@snllp.com
2  JEFFREY A. TOPOR (SBN 195545)
   jtopor@snllp.com
3  LIANA MAYILYAN (SBN 295203)
   lmayliyan@snllp.com
4  SIMMONDS & NARITA LLP
   44 Montgomery Street, Suite 3010
5  San Francisco, CA 94104-4816
   Telephone: (415) 283-1000
6  Facsimile: (415) 352-2625

7  Attorneys for Defendants
   Midland Credit Management, Inc.
8  and Midland Funding, LLC

9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13

14  ELLEN ANNETE GOLD, on behalf    )  CASE NO.: 5:13-cv-02019-BLF
    of herself and all others similarly )
15  situated,                        )  **NOTICE OF MOTION AND MOTION**
                                      )  **FOR SUMMARY JUDGMENT BY**
16            Plaintiff,              )  **DEFENDANT MIDLAND CREDIT**
                                      )  **MANAGEMENT, INC.;**
17       vs.                          )  **MEMORANDUM OF POINTS AND**
                                      )  **AUTHORITIES IN SUPPORT**
18  MIDLAND CREDIT                    )
    MANAGEMENT, INC., a Kansas        )  Date:   January 8, 2015
19  corporation; and MIDLAND          )  Time:   9:00 a.m.
    FUNDING, LLC, a Delaware limited  )  Ctrm:  3, 5th Floor
20  liability company,                )
                                      )
21            Defendants.             )  The Honorable Beth Labson Freeman
    _____  )

22

23

24

25

26

27

28

1   TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE THAT on Thursday, January 8, 2015, at 9:00 a.m. in

3   Courtroom 3, 5th Floor of the above Court, located at 280 South First Street, San

4   Jose, California, 95113, the Honorable Beth Labson Freeman presiding, defendant

5   Midland Credit Management, Inc. will and hereby does move this Court for an Order

6   granting summary judgment in its favor, pursuant to Rule 56 of the Federal Rules of

7   Civil Procedure.

8          This motion is made on the grounds that Plaintiff has failed to produce

9   admissible evidence showing there is a genuine dispute as to any material fact

10  bearing on her claims, and Defendant is entitled to judgment as a matter of law.

11         The Motion is based on this Notice of Motion and Motion, the Memorandum

12  of Points and Authorities in Support of the Motion, the Separate Statement in

13  Support of the Motion, the declarations of Angelique Ross and Tomio B. Narita in

14  support of the motion, filed concurrently herewith, all of the other papers on file in

15  this action, and such other and further evidence or argument as the Court may allow.

16

17  DATED:  October 30, 2014          SIMMONDS & NARITA LLP
                                       TOMIO B. NARITA
18                                     JEFFREY A. TOPOR
                                       LIANA MAYILYAN
19

20                                     By:   s/Jeffrey A. Topor
21                                           Jeffrey A. Topor
                                             Attorneys for Defendants
22                                           Midland Credit Management, Inc.
                                             and Midland Funding, LLC
23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . 2

III.   ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.   Legal Standard Governing Summary Judgment. . . . . . . . . . . . . . . . . . 4

    B.   Gold's Claims Fail Because, When Read As A Whole And In
        Context, The Letter And The Brochure Were Not Materially False,
        Deceptive, Or Misleading. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        i.   The Least Sophisticated Debtor Would Not Be Confused By
            References To The "Past Due Account With HSBC Nevada
            Bank, N.A." And Would Understand This Referred To The
            Account Purchased By Midland Funding When The Letter Is
            Read As A Whole, From The Perspective Of The Least
            Sophisticated Debtor, And Considering The Debtor's
            Knowledge Of The Account History. . . . . . . . . . . . . . . . . . . . . . 6

        ii.   The Letter Was Not Materially Misleading As It Did Not
            Frustrate The Consumer's Ability To Intelligently Choose A
            Response. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        iii.   The Letter Properly Informed Gold That Payments Made To
            MCM Might Improve Her Credit Report. . . . . . . . . . . . . . . . . . 13

        iv.   Gold's Claim Also Fails Because The Response To The
            Letter Was Handled By Her FDCPA Counsel. . . . . . . . . . . . . . 17

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Becker v. Genesis Fin. Servs.*
2007 WL 4190473 (E.D. Wash. Nov. 21, 2007)........................... 6

*Campuzano-Burgos v. Midland Credit Mgmt., Inc.*
550 F.3d 294 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Catherman v. Credit Bureau of Greater Harrisburg*
634 F. Supp. 693 (E.D. Pa. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Clark v. Capital Credit & Collection Servs., Inc.*
460 F.3d 1162 (9th Cir. 2006).................................. 6, 8, 11

*Devereaux v. Abbey*
263 F.3d 1070 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Donohue v. Quick Collect, Inc.*
592 F.3d 1027 (9th Cir. 2010)................................. *passim*

*Dunlap v. Credit Protection Ass'n*
419 F.3d 1011 (9th Cir. 2005).................................. 7, 14

*Durkin v. Equifax Check Servs., Inc.*
406 F.3d 410 (7th Cir. 2005)................................ 5, 14, 15

*Erickson v. Performant Recovery, Inc.*
2013 WL 3223367 (D. Minn. June 25, 2013)........................ 16

*Federal Election Comm'n v. Toledano*
317 F.3d 939 (9th Cir. 2002)...................................... 4

*Federal Home Loan Mortgage Corp. v. Lamar*
503 F.3d 504 (6th Cir. 2007)...................................... 7

*Gonzales v. Arrow Fin. Servs., LLC*
660 F.3d 1055 (9th Cir. 2011)..................................... 7

*Greco v. Trauner, Cohen & Thomas, L.L.P.*
412 F.3d 360 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gruber v. Creditors' Protection Serv.*
742 F.3d 271 (7th Cir. 2014)..................................... 17

*Guerrero v. RJM Acquisitions, LLC*
499 F.3d 926 (9th Cir. 2007)................................. 6, 7, 18

*Hahn v. Triumph Partnerships LLC*
557 F.3d 755 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

*Hapin v. Arrow Fin. Servs.*
428 F. Supp. 2d 1057 (N.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hartley v. Suburban Radiologic*
295 F.R.D. 357 (D. Minn. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hogan v. MKM Acquisitions, LLC*
241 F. Supp. 2d 896 (N.D. Ill. 2003)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hutton v. Law Offices of Collins & Lamore*
668 F. Supp. 2d 1251 (S.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Jones v. CBE Group, Inc.*
215 F.R.D. 558 (D. Minn. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Kimmel v. Cavalry Portfolio Servs., LLC*
2011 WL 3204841 (E.D. Pa. July 28, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Miller v. Javitch, Block & Rathbone*
561 F.3d 588 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Peter v. GC Servs.. L.P.*
310 F.3d 344 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Peters v. General Serv. Bureau. Inc.*
277 F.3d 1051 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ross v. CNAC*
2014 WL 1092082 (W.D.N.C. Mar. 17, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Satterfield v. Simon & Schuster, Inc.*
569 F.3d 946 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State of Calif., on Behalf of Calif. Dept. of Toxic Substances Control v. Campbell*
138 F.3d 772 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Swanson v. Southern Ore. Credit Serv., Inc.*
869 F.2d 1222 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Terran v. Kaplan*
109 F.3d 1428 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wade v. Regional Credit Ass'n*
87 F.3d 1098 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Wahl v. Midland Credit Mgmt., Inc.*
556 F.3d 643 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 10

*White v. Financial Credit Corp.*
2001 WL 1665386 (N.D. Ill. Dec. 27, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Wright v. Credit Bureau of Ga.*
555 F. Supp. 1005 (N.D. Ga. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Zemeckis v. Global Credit & Collection Corp.*
679 F.3d 632 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL STATUTES**

Federal Rules of Civil Procedure
        56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fair Debt Collection Practices Act
        15 U.S.C. § 1692, *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
        § 1692e. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
        § 1692e(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        § 1692e(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14
        § 1692e(10). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 14
        § 1692f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        § 1692g. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATE STATUTES**

California Fair Debt Collection Practices Act ("the Rosenthal Act")
        Cal. Civ. Code § 1788, *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
        § 1788.17. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# I.      INTRODUCTION

Plaintiff Ellen Annette Gold's ("Gold") claim against Midland Credit Management, Inc. ("MCM") is premised on one, out of nearly a dozen, letters that MCM sent to her.[1]  The previous letters, as well as the letter at issue, consistently and repeatedly stated that Midland Funding, LLC ("Midland Funding")[2] now owned her defaulted debt on her HSBC Bank Nevada, N.A. ("HSBC") credit card account (the "Account").  Despite these clear representations of Account ownership, Gold contends the letter at issue: (1) misrepresented that a payment by Gold to MCM would reduce her past due balance with HSBC and falsely suggested that Defendants could alter how HSBC was reporting her account to the credit reporting agencies; and (2) improperly suggested that a good credit report could benefit her.  Based on this, she asserts Defendants violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.*, and the California Fair Debt Collection Practices Act ("the Rosenthal Act"), Cal. Civ. Code §§ 1788, *et seq.*  Her claims fail.

First, Gold's interpretation of the letter is a wholly idiosyncratic reading of the letter and inconsistent with how even the least sophisticated debtor would interpret the letter.  On the contrary, the letter accurately informs the reader that their HSBC account is now owned by Midland Funding, and that if payments are made to MCM, the balance on the account will be reduced.  The letter also correctly advises the recipient that if the settlement payments were completed, the Account would be reported as "paid in full" to the consumer reporting agencies.  The letter does not suggest or imply that Defendants are collecting on behalf of HSBC or that they can

---

[1] Gold testified she did not remember receiving the first eight letters that MCM sent, suggesting they were not received because they were addressed to the wrong post box number at the private post office box service she had used for years.  She did recall the ninth letter, however, which she immediately shared with her counsel and which forms the basis of this suit.

[2] Collectively, Midland Funding and MCM will be referred to as "Defendants."

1  influence the way that HSBC might be reporting the Account.

2          Second, even if the statements in the letter could somehow be misinterpreted to

3  mean that MCM could change HSBC's reporting on the account, which is an

4  untenable reading of the letter, this misrepresentation would be immaterial.  To

5  prevail, Gold must prove that the letter contains a false or misleading statement that is

6  "material" - *i.e.*, one that would frustrate the ability of the hypothetical "least

7  sophisticated" debtor to formulate an intelligent response.  If Gold made payments to

8  MCM such that the balance on the Account was deemed satisfied, MCM could and

9  would update Midland Funding's reporting on the Account, which would have the

10  same effect on Gold's credit score if HSBC changed its reporting on the Account.

11  There is simply nothing materially misleading about the letter.  Summary judgment is

12  proper here.

13  **II.      STATEMENT OF UNDISPUTED MATERIAL FACTS**

14          When Gold stopped paying on her Account, HSBC charged it off and sold it to

15  Midland Funding.  *See* Moving Separate Statement ("MSS"), at Issue 1, Fact 1.[3]

16  MCM sent Gold a series of settlement letters over a two-year span.  *See id.* at Issue 1,

17  Fact 9.  None of the letters were returned by the postal service to MCM as

18  undeliverable.[4]  *See id.* at Issue 1, Fact 10.  During this period, Gold was represented

19  _____

20          [3] Midland Funding purchases defaulted accounts from original creditors, but it has

21  no employees and does not engage in collection activity.  Thus, pursuant to an

    intercompany agreement, Midland Funding referred the Account to MCM for collection.

22  *See id.* at Issue 1, Fact 2.

23

24          [4] Gold testified that the only letter she could recall receiving from MCM was the

    letter dated May 3, 2012, which forms the basis of her lawsuit.  She claimed that she

25  could not be sure whether she received any of the other letters MCM sent her because

    they were all addressed to suite (box) number 200 at 3790 El Camino Real, Palo Alto,

26  California, and her correct address was suite (box) number 2001, not number 200.

    When presented with a copy of the May 3 letter, though, Gold had no trouble

27  remembering that she received it, even though it, too, was addressed incorrectly.  Gold's

28  testimony is not credible, and because none of the letters that MCM sent her was

1   by her present counsel, Fred Schwinn, whom she had retained as her "regular lawyer"

2   to handle all of her collection-related matters, including the defense of no less than

3   three debt collection lawsuits filed against her, and the prosecution of three federal

4   FDCPA actions filed against other collectors. *See id.* at Issue 2, Fact 2.

5        On May 3, 2012, MCM sent Gold the letter at issue here. *See id.* at Issue 1,

6   Fact 4. It identified the original creditor ("HSBC Bank Nevada, N.A.") and the

7   current owner ("Midland Funding LLC"), and included the following relevant text:

8       Dear Ellen,

9       Your credit balance can help you reach your goals – or it can hold you back.
10       Your past due balance of $3647.81 with HSBC Bank Nevada, N.A. is being
        reported to the credit reporting bureaus and remains a negative item on your
11      credit report.

12       Reduce the amount you owe and resolve your bill with these 2 options:

13       . . . .

14       If you are unable to make the payments required with the two options above,
        we may be able to set up payments as low as $50 each month to help you
15      resolve this past due bill.

16       We can help you get back on track. When you call, our skilled Account
        Managers will help you find a solution that fits your budget and your timeline.

17       Don't miss this opportunity to reduce the amount you owe and resolve this past
18      due bill. We look forward to assisting you.

19       Sincerely,

20       [signature, name and title omitted]

21       P.S. We've included a free educational brochure for you, *Why paying your bill
        is so important to a good credit report*.

22   *Id.* at Issue 1, Fact 6. The letter stated along the right hand margin "We can help you

23   reduce your past due balance with HSBC Bank Nevada, N.A. and get your finances

24   back on track" and that her "credit report will be updated with each payment made,

25   and once you've completed your agreed-upon payments to settle the account your

26

27 _____

28   returned as undeliverable, the Court may presume that she received each of the letters,
  pursuant to the mailbox rule.

credit report will be updated as 'Paid in Full'!" *See id.* at Issue 1, Fact 7. Included with the letter was a brochure explaining some of the benefits of having good credit. *See id.* at Issue 1, Fact 8.

Gold immediately turned the letter over to Mr. Schwinn for handling. *See id.* at Issue 2, Fact 2. She did not "really think about [the letter] too specifically," nor did she have "any particular reaction" to the brochure, because she wanted Mr. Schwinn's "professional advice." *See id.* Issue 2, Fact 3. Ultimately, Gold worked with Mr. Schwinn in deciding how to respond, resting her decision on the advice that she received from him. *See id.* Issue 2, Fact 4. She felt an "intelligent" response to the letter was "that I sent it to an expert to evaluate for me." *See id.* Issue 2, Fact 5. Gold later filed this putative class action lawsuit, using Mr. Schwinn as her counsel.

## III.   ARGUMENT

### A.   Legal Standard Governing Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the moving party, Defendant may discharge its burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *accord Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex*).

To survive this motion for summary judgment, Gold "must present competent evidence that creates a genuine issue of material fact." *See Federal Election Comm'n v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002). The materiality of a fact is determined by the underlying substantive law. *See State of Calif., on Behalf of Calif. Dept. of Toxic Substances Control v. Campbell*, 138 F.3d 772, 782 (9th Cir. 1998). "Summary judgment is appropriate when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law." *Satterfield v. Simon &*

1 | *Schuster, Inc.*, 569 F.3d 946, 950 (9th Cir. 2009). "In short, 'summary judgment is
2 | appropriate if, on the record as a whole, a rational trier of fact could not find for the
3 | non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th
4 | Cir. 2005) (affirming summary judgment on FDCPA claims).

5 |    **B.    Gold's Claims Fail Because, When Read As A Whole And In**
6 |         **Context, The Letter And The Brochure Were Not Materially False,**
        **Deceptive, Or Misleading**

7 |        Gold contends Defendants violated the FDCPA and the Rosenthal Act based
8 | solely on the contents of the May 3, 2012 letter and the enclosed "educational
9 | brochure." *See* Doc. No. 1 at ¶¶ 31-36. She alleges they "falsely, deceptively and
10 | misleadingly misrepresented that payment to Defendants would reduce [her] past due
11 | balance with HSBC Bank," and they "falsely, deceptively and misleadingly
12 | misrepresented that Defendants could alter the manner in which HSBC Bank . . . was
13 | reporting [her] debt to the credit bureaus," thereby violating sections 1692e, 1692e(5)
14 | and 1692e(10) of the FDCPA, and section 1788.17 of the Rosenthal Act. *See id.* at ¶¶
15 | 45, 54.[5] When the May 3 letter and the accompanying brochure are read as a whole,
16 | and in conjunction with the account history, the statements about which Gold
17 | complains were not materially misleading. Accordingly, her claims fail and summary
18 | judgment in favor of Defendants is appropriate.

19 | //
20 | //
21 | //

22 |
---

23 |        [5] Section 1692e of the FDCPA provides that debt collectors "may not use any
24 | false, deceptive, or misleading misrepresentation or means in connection with the
collection of any debt," 15 U.S.C. § 1692e, and prohibits "[t]he threat to take any action
25 | that cannot legally be taken or that is not intended to be taken" and "[t]he use of any
false representation or deceptive means to collect or attempt to collect any debt or to
26 | obtain information concerning a consumer," *see id.* §§ 1692e(5), (10). Section 1788.17
27 | of the Rosenthal Act, meanwhile, incorporates by reference various provisions of the
FDCPA, including those that Defendants allegedly violated. *See* Cal. Civ. Code §
28 | 1788.17.

1

> **i.** **The Least Sophisticated Debtor Would Not Be Confused By References To The "Past Due Account With HSBC Nevada Bank, N.A." And Would Understand This Referred To The Account Purchased By Midland Funding When The Letter Is Read As A Whole, From The Perspective Of The Least Sophisticated Debtor, And Considering The Debtor's Knowledge Of The Account History**

2

3

4

5       Gold claims the May 3 letter was false and misleading because it implied

6   Defendants could impact HSBC's reporting of the Account in referencing her "past

7   due balance with HSBC."  Gold's interpretation of the letter strains credulity and is a

8   wholly idiosyncratic interpretation of the letter.

9       The court applies the "least sophisticated debtor" standard to determine

10  whether a debt collector's communication complies with the FDCPA.  *See Guerrero*

11  *v. RJM Acquisitions, LLC*, 499 F.3d 926, 934 (9th Cir. 2007).[6]  Under this objective

12  standard, a communication violates the FDCPA only if the least sophisticated debtor

13  "would likely be misled by the [communication]."  *Swanson v. Southern Ore. Credit*

14  *Serv., Inc.*, 869 F.2d 1222, 1225 (9th Cir. 1989) (per curiam).  Although objective,

15  "the standard is lower than simply examining whether particular language would

16  deceive or mislead a reasonable debtor."  *Id.* at 1227.  The Court employs this

17  standard "to ensure that even the least sophisticated debtor is able to understand,

18  make informed decisions about, and participate fully and meaningfully in the debt

19  collection process."  *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162,

20  1171 (9th Cir. 2006).[7]

21

_____

22      [6] This standard must not be "taken literally," of course, otherwise the consumer

23  would not even be able to read.  *See Hutton v. Law Offices of Collins & Lamore*, 668 F.

    Supp. 2d 1251, 1256 (S.D. Cal. 2009).  Thus, although the standard is protective of
24
    consumers, it is not without limits.  Unreasonable or idiosyncratic interpretations of

25  collection notices must be rejected.  *See, e.g., Becker v. Genesis Fin. Servs.*, 2007 WL

26  4190473, *7 (E.D. Wash. Nov. 21, 2007).

27      [7] Where a collector's communication encourages a consumer to waive or ignore

    the consumer's rights under the FDCPA, the Ninth Circuit has found a violation of the
28
    Act.  *See id.*, citing *Terran v. Kaplan*, 109 F.3d 1428, 1434 (9th Cir. 1997); *Swanson*,

1   Although forgiving, the "least sophisticated debtor" standard presumes a

2   consumer will read collection communications "as a whole" and with some degree of

3   care. *See Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1064 (9th Cir. 2011).

4   Even the hypothetical "least sophisticated consumer" is presumed to have a "basic

5   level of understanding and willingness to read with care." *See id.* at 1062.[8] Thus, the

6   language challenged by a consumer is not read in isolation.  It must be considered in

7   context, which includes the "form and content" of the challenged communication,

8   and, when appropriate, other communications with the debtor. *See Guerrero*, 499

9   F.3d at 934 (reviewing two letters in tandem and rejecting argument that letters "were

10  sufficiently confusing so as to mislead least sophisticated debtor into believing

11  [defendant] was attempting to collect on two accounts"; when letters were read

12  together, it was clear defendant was attempting to collect only one account); *Dunlap*

13  *v. Credit Protection Ass'n*, 419 F.3d 1011, 1012 (9th Cir. 2005) (per curiam)

14  (considering letter's "main text" in rejecting consumer's suggested inference to be

15  drawn from challenged language).

16      The idea that the Court must examine the whole picture, including the

18  869 F.2d at 1226.

19      [8] *See also Wahl v. Midland Credit Mgmt., Inc*., 556 F.3d 643, 645 (7th Cir. 2009)

20  ("The unsophisticated consumer isn't a dimwit.  She may be uninformed, naive, and
    trusting, but she has rudimentary knowledge about the financial world and is capable of

21  making basic logical deductions and inferences.") (citations and internal quotations

22  marks omitted); *Campuzano-Burgos v. Midland Credit Mgmt., Inc*., 550 F.3d 294, 299

23  (3d Cir. 2008) ("Even the least sophisticated debtor is bound to read collection notices
    in their entirety."); *Federal Home Loan Mortgage Corp. v. Lamar*, 503 F.3d 504, 510

24  (6th Cir. 2007) (standard assumes collection notice is read "in its entirety, carefully and

25  with some elementary level of understanding."); *Greco v. Trauner, Cohen & Thomas,*
    *L.L.P.*, 412 F.3d 360, 363 (2d Cir. 2005) ("[E]ven the least sophisticated consumer can

26  be presumed to possess a rudimentary amount of information about the world and a

27  willingness to read a collection notice with some care.") (citations and internal quotation

28  marks omitted); *Peter v. GC Servs., L.P.*, 310 F.3d 344, 349 (5th Cir. 2002) ("When the
    letter is read as a whole" there was no violation of the Act).

consumer's unique circumstances, and not just look at the challenged communication in a vacuum is not new.  For example, in *Clark*, after the consumer sent letters to a collection attorney, directing him to stop calling, the consumer called the attorney to discuss the debt.  *See* 460 F.3d at 1167.  When the attorney returned the consumer's call, the consumer claimed this violated the FDCPA, in light of her written cease-and-desist request.  *See id.* at 1167-68.  The Court held that the consumer had waived any claim based on the return call.  *See id.* at 1171.  Significantly, the Court did not simply consider the collector's call in isolation.  It evaluated that call in context, considered the prior communications, and, using the least sophisticated debtor standard, held that the consumer had waived her cease and desist directive.  *See id.* at 1172.

Even the "least sophisticated debtor" has an understanding of the account's history that must be considered.  For example, in *Wahl*, the consumer argued the phrase "principal balance" was false, because it did not disclose this amount also included interest and late fees imposed by the original creditor.  *See* 556 F.3d at 645.  Recognizing that even the "unsophisticated consumer" is "capable of making basic logical deductions and inferences," the court rejected this argument, holding instead that the "unsophisticated consumer, **with a reasonable knowledge of her account's history**, would have little trouble concluding that the 'principal balance' included interest charged by [the original creditor]." *Id.* at 645-46 (internal quotations marks omitted; emphasis added).  Thus, a challenged communication must be read in its entirety and in context, considering all of the surrounding circumstances, including the consumer's knowledge of the account history.[9]

Here, even the least sophisticated debtor would understand that when the May 3 letter referred to the "past due balance with HSBC Bank Nevada, N.A.," this

---

[9]  The Ninth Circuit cited *Wahl* with approval in *Donohue v. Quick Collect*, 592 F.3d 1027, 1033 (9th Cir. 2010).

1  was:  (1) to help identify the account at issue; and (2) a shorthand way of referencing

2  the Account that had been purchased by Midland Funding.  MCM sent Gold eight

3  letters before it mailed the May 3 letter and they all made clear that the Account was

4  an HSBC credit card debt now owned by Midland Funding.[10]  In addition, to better

5  orient the reader as to which account was at issue, the May 3 letter referred to the

6  obligation Gold <u>previously</u> incurred to HSBC, and listed the "Original Creditor" as

7  HSBC Nevada Bank, N.A. and the "Current Owner" as "Midland Funding LLC."  *See*

8  MSS, at Issue 1, Fact 13.

9  Notably, the letter does <u>not</u> say that Gold <u>currently</u> has a balance due with

10  HSBC, or that MCM was seeking to collect money on behalf of HSBC, or that HSBC

11  was still reporting her account to the consumer reporting agencies, or that Defendants

12  could alter how HSBC might have been reporting the account to the credit reporting

13  agencies.  There is simply nothing misleading in stating that payment would reduce

14  the past due balance on the Account.

15  Gold does not dispute that she did not pay her HSBC card, and thus the

16  Account purchased by Midland Funding does, in fact, reflect her "past due balance

17  with HSBC Bank Nevada, N.A."  Gold's contention that the May 3 letter suggests

18  _____

19  [10] Although Gold claims she received only one of those letters, none of the letters
were returned by the post office to MCM.  The notion that Gold received only one of the

20  letters – which she immediately sent to her attorney to review and which forms the basis

21  of her lawsuit – when all of the letters were sent to the same address strains credulity.
The more plausible scenario is that Gold received each letter and ignored it or forwarded

22  it to her counsel, waited for him to tell her what to do, and the two of them then decided
to sue Defendants.  The first letter notified Gold that Midland Funding had purchased

23  her HSBC account and that MCM was servicing the account for Midland Funding,

24  stated the exact amount due, and offered Gold a number of payment options as well as
a the opportunity to settle the account at a steep discount.  The letter also invited Gold

25  to call MCM if she was unable to take advantage of the options offered, noting that there

26  were other options for resolving her debt.  Every other one of the letters that MCM sent
Gold included a similar invitation.  Gold never contacted MCM in response to any of

27  the letters, either to dispute that she owed the money, to ask questions about the debt or

28  to work out a resolution.  *See* MSS, at Issue 1, Facts 11, 12.

1  payments made in response to it would reduce the balance of an account that was

2  currently owned by HSBC is a wholly unreasonable and idiosyncratic interpretation

3  of the May 3 letter.  There was nothing false or misleading about the statement that

4  Gold could reduce her "past due balance" by making a payment to MCM.

5            **ii.    The Letter Was Not Materially Misleading As It Did Not**
              **Frustrate The Consumer's Ability To Intelligently Choose A**
6            **Response**

7            It is not enough for Gold to establish that the letter contained a false or

8  misleading statement (which it does not).  An alleged false or misleading statement

9  will violate the FDCPA only if the statement is "material."  *Donohue*, 592 F.3d at

10  1033-34.[11]

11            Relying on the Seventh Circuit's *Hahn* decision, the Ninth Circuit observed in

12  *Donohue* that "materiality is an ordinary element of any federal claim based on a false

13  or misleading statement" and there is "no reason why materiality should not be

14  equally required in an action based on § 1692e."  592 F.3d at 1033 (*quoting Hahn*,

15  557 F.3d at 757).  The Court also noted that the "purpose of the FDCPA, **to provide**

16  **information that helps consumers chose intelligently**, would not be furthered by

17  creating liability as to immaterial information, because by definition immaterial

18  information neither contributes to that objective (if the statement is correct) nor

19  undermines it (if the statement is incorrect)."  *Id*. (quoting *Hahn* at 757-58) (emphasis

20

21            [11]  *See also Hahn v. Triumph Partnerships LLC*, 557 F.3d 755 (7th Cir. 2009)
22  (letter that accurately stated total amount due did not violate §§ 1692e or e(2)); *Wahl*,
     556 F.3d at 646 ("If a statement would not mislead the unsophisticated consumer, it
23  does not violate the FDCPA - even if it is false in some technical sense."); *Miller v.
     Javitch, Block & Rathbone*, 561 F.3d 588, 596 (6th Cir. 2009); *Peters v. General Serv.*
24  *Bureau, Inc.*, 277 F.3d 1051, 1055 (8th Cir. 2002) (the unsophisticated debtor standard
25  was "designed to protect consumers of below average sophistication or intelligence, but
     [] also contain[s] an objective element of reasonableness that prevents liability for
26  bizarre or idiosyncratic interpretations of collection notices.") (citations omitted).  A
27  statement that is merely "susceptible of an ingenious misreading" does not violate the
     FDCPA.  *Peters*, 277 F.3d at 1056.
28

1  added, internal quotation marks omitted).  The Ninth Circuit then explained a

2  statement cannot be "material" unless it impacts a consumer's ability to intelligently

3  respond:

> We noted in *Clark* that the FDCPA's remedial purpose is animated by 'the
> likely effect of various collection practices on the minds of unsophisticated
> debtors.' *Id.* at 1179.  **But immaterial statements, by definition, do not
> affect a consumer's ability to make intelligent decisions**. *See Hahn*, 557
> F.3d at 757-58.  We recognize, as the Seventh Circuit already has, that the
> materiality requirement functions as a corollary inquiry into whether a
> statement is likely to mislead an unsophisticated consumer.  The materiality
> inquiry focuses our analysis on the same ends that concerned us in *Clark* -
> protecting consumers from misleading debt-collection practices.

9  *Donohue*, 592 F.3d at 1033-34.

10        Furthermore, there is a temporal component to the consumer's decision-making

11  process when they are choosing an intelligent response.  In *Donohue*, the challenged

12  communication was a state court complaint served on the debtor.  The Court noted

13  that Donohue's intelligent responses to the complaint were either to appear in the suit

14  to challenge "the accuracy or legality of the total debt and principal owed, futile as

15  that may have been" or to pay the amount requested.  *See id.* at 1034.  The Court also

16  left open the possibility that an error in a collection complaint can be corrected if it is

17  done "before an answer was filed." *See id.* at 1032, n.1.  In other words, the Ninth

18  Circuit recognized that a consumer does not make an instantaneous decision about

19  how to intelligently respond to a collection communication, but rather considers those

20  options over time.

21        After explaining the materiality doctrine, the *Donohue* Court applied it and

22  ruled for the defendant.  The state court complaint had sought the "sum of $270.99,

23  together with interest thereon of 12% per annum . . . in the amount of $32.89." *Id.* at

24  1029.  The collector was entitled to the $32.89, but that figure was not actually

25  composed of 12% interest on the principal balance due.[12]  Thus, the statement was

26

27        [12]  Rather, the $32.89 figure was comprised of $24.07 in pre-assignment finance
    charges (calculated at a different interest rate) and $8.82 in post-assignment interest
28  calculated at the 12% annual rate.

1  technically false.  *See id*. at 1034.  The Court reasoned, however, that nothing alleged

2  in the complaint undermined the plaintiff's ability to intelligently choose a response:

> In assessing FDCPA liability, we are not concerned with mere technical
> falsehoods that mislead no one, but instead with **genuinely misleading**
> **statements that may frustrate a consumer's ability to intelligently choose**
> **his or her response**.  Here, the statement in the Complaint **did not undermine**
> **Donohue's ability to intelligently choose her action concerning her debt**.
> Based on the information in the Complaint, Donohue could have challenged
> the accuracy or legality of the total debt and principal owed, futile as that may
> have been, or Donohue could have paid the accurately stated sum to settle her
> debt.  Even if the Complaint had separated $32.89 into interest and finance
> charges, **we can conceive of no action Donohue could have taken that was**
> **not already available to her on the basis of the information in the**
> **Complaint - nor has Donohue articulated any different action she might**
> **have chosen**.  Therefore, we conclude that the statement in the Complaint was
> not material and hence not actionable under §§ 1692e and 1692f.

*Id.* (emphasis added).

*Donohue* reflects a growing consensus among the circuits that rejects hyper-

technical alleged violations of the FDCPA.  This is consistent with the remedial

nature of the Act, because "immaterial statements, by definition, do not affect a

consumer's ability to make intelligent decisions."  *Id.*  Under *Donohue*, Gold must

provide proof of a "material" misstatement, *i.e.*, one that is "genuinely misleading"

and that "**may frustrate the consumer's ability to intelligently choose his or her**

**response**" to the collector's communication.  *Id.* at 1034 (emphasis added); *see also*

*Hahn*, 557 F.3d at 757-58.  The Court must determine the available responses to a

communication and how, if at all, the allegedly confusing language prevented the

consumer from intelligently choosing among those responses.  As explained below,

when read as a whole and in the proper context, the May 3 letter and enclosed

brochure did not contain any false, deceptive, or misleading statements, let alone any

statements that would frustrate the least sophisticated debtor's ability to respond.

MCM's May 3 letter, read as a whole and in context, is not materially

confusing or misleading.  As discussed above, the least sophisticated debtor would

know the letter referred to "your HSBC account" to help identify the account at issue

here, not to suggest Defendants could alter how HSBC might have been reporting the

account to the credit reporting agencies.  Regardless, even if a consumer believed
HSBC was reporting information about the account, and the letter was offering to
change that reporting, this mistaken interpretation would not be material.  The
undisputed evidence shows that MCM could update the Midland Funding reporting,
which would have had the same effect on the debtor's credit score as the debtor
anticipated and desired.  *See* MSS, at Issue 1, Fact 15.

The reference to the "past due balance with HSBC" and the opportunity for the
consumer to improve his or her credit report would not cause the least sophisticated
debtor to act differently, or limit the ability of the consumer to make an intelligent
choice on how to respond.  Accordingly, the statements are not material and
Defendants are entitled to summary judgment.

### iii.   The Letter Properly Informed Gold That Payments Made To MCM Might Improve Her Credit Report

Gold contends it was improper for the May 3 letter to suggest that making
payments to MCM could have a beneficial effect on her credit.[13]  Gold is wrong.
Indeed, the Ninth Circuit and other courts have repeatedly recognized that when
consumers pay their debts, this is likely to improve their credit.  These courts have
held collectors can, and probably should, remind consumers of this fact in order to
encourage them to pay.

The Ninth Circuit recognized that a collector could "properly" notify a
consumer that nonpayment of a debt "could adversely affect her credit reputation" in
*Wade v. Regional Credit Ass'n*, 87 F.3d 1098 (9th Cir. 1996).  There, the collector
sent a letter stating "if not paid TODAY, it may STOP YOU FROM OBTAINING
credit TOMORROW.  PROTECT YOUR CREDIT REPUTATION.  SEND

---

[13]   The May 3 letter accurately stated that Gold's account was appearing as a
"negative item on [her] credit report," and accurately stated that the report would be
"updated with each payment made" and that the account would be reported as "Paid In
Full" once the agreed payments were made.  *See* MSS, at Issue 1, Fact 15.  There was
nothing false about these statements.

PAYMENT TODAY . . . DO NOT DISREGARD THIS NOTICE. YOUR CREDIT REPUTATION MAY BE ADVERSELY EFFECTED." *Id*. at 1099. The Ninth Circuit rejected the consumer's claim that the letter violated sections 1692e, 1692e(5) and 1692e(10) of the FDCPA, noting: "[t]he body of the notice was informational, notifying Wade that failure to pay could adversely affect her credit reputation. . . . The least sophisticated debtor would construe the notice as a prudential reminder, not as a threat to take action. . . . The notice told Wade correctly that she had an unpaid debt, and properly informed her that failure to pay might adversely affect her credit reputation." *Id*. at 1100.[14]

Similarly, the Seventh Circuit held it was proper for a collector to "encourage debtors to pay their debts by informing them of the possible negative consequences of failing to pay" in *Durkin v. Equifax Check Servs., Inc*., 406 F.3d 410, 418 (7th Cir. 2005). There, the collector's letter told the consumer that "CONTINUED REFUSAL TO HONOR THIS RETURNED CHECK WILL RESULT IN YOUR CREDIT FILE BEING IMPACTED WITH A NEGATIVE REFERENCE WHICH MAY IMPACT FUTURE CREDIT GRANTING DECISIONS." *Id*. at 425. The Court rejected the consumer's FDCPA claim, stating such language would not only "promote payment of valid debts" it also "promotes disclosing genuine claims of invalid debts . . . . Undeniably, one way to encourage someone with a true dispute to come forward and resolve that dispute is to inform him of the possible negative consequences of his continued inaction. Promoting final resolution of such matters, either way, is

---

[14] *See also Dunlap*, 419 F.3d at 1012-13 ("Nor is there any threat of unintended action: CPA's collection letter, at worst, only vaguely and generally implies that the reader should pay his debt in order to protect his credit rating. In *Wade* . . . , the challenged dunning letter contained statements that warned of possible credit-rating damage far more expressly than any language in the CPA letter, yet we concluded that the *Wade* letter contained 'no threat.' *Id*. at 1099-1100. Thus, even assuming that the least sophisticated debtor would construe CPA's notice as some kind of warning, it cannot be characterized as a threat for the purpose of 15 U.S.C. § 1692e(5) under the standard set in *Wade*.").

1   inherently beneficial." *Id*. at 418, n. 7.

2       The Fifth Circuit embraced the reasoning of the *Durkin* case in *McMurray v.*

3   *ProCollect, Inc.*, 687 F.3d 665 (5th Cir. 2012).  There, the collector's letter warned

4   the consumer of the negative consequence of nonpayment as follows:

5       It is important that you pay your debt as failure to timely validate the
        referenced amount due will cause us to report your account to the credit
6       reporting agencies.  The negative mark can remain on your credit for up to
        seven (7) years, and may among other things significantly affect your ability to:
7       (1) OBTAIN CREDIT; (2) OBTAIN EMPLOYMENT; (3) PURCHASE
        HOME OR CAR; OR (4) QUALIFY FOR APARTMENT RENTAL.

8   *Id*. at 667.  The Fifth Circuit, noting that "[t]he supposed threat falls in the category of

9   letters that encourage debtors to pay their debts by informing them of the possible

10  negative consequences of failing to pay, words that do not overshadow the required

11  notice language[,]" rejected the consumer's argument that this language amounted to

12  a "threat" that overshadowed the validation notice in violation of section 1692g of the

13  FDCPA.  *Id.* at 671 (citations and quotation marks omitted).

14      During the past three decades, district courts from around the country have

15  repeatedly held that collectors may properly inform consumers about the adverse

16  credit consequences resulting from their failure to pay, as well as benefits resulting

17  from satisfying their obligations.[15]  As these cases demonstrate, there is

18

19      [15] *See, e.g., Wright v. Credit Bureau of Ga.,* 555 F. Supp. 1005, 1007 (N.D. Ga.
20  1983) ("If the defendants' letters contain any threat to a consumer's credit rating, the
    threat is at most a statement that the results of the defendants' collection efforts may
21  some day affect the debtor's credit rating.  Thus the letters convey no specific threat
    greater than the well-known fact, recognized by all consumers, regardless of the degree
22  of their sophistication, that a failure to pay one's bills will affect his ability to obtain
    credit in the future.  Such a threat does not violate the FDCPA."); *Catherman v. Credit*
23  *Bureau of Greater Harrisburg*, 634 F. Supp. 693, 695 (E.D. Pa. 1986) (letter designed
24  to cause reader to question long-term effect of failure to pay and suggesting "that it
    could result in a future denial of credit" – warning debtor "DO NOT TAKE A
25  CHANCE" – not false, deceptive, unfair or unconscionable; concluding that "even an
    unsophisticated consumer is not likely to believe that he would immediately be denied
26  credit, but rather that there is a chance of denial of credit if the debt is not paid"); *White*
27  *v. Financial Credit Corp.*, 2001 WL 1665386, *5 (N.D. Ill. Dec. 27, 2001) (letter
28

nothing improper with advising debtors about the potential <u>negative</u> consequences of

the failure to satisfy their obligations.  Concomitantly, there is nothing wrong with

doing what MCM's letter did, *i.e*, informing the reader of the potential <u>positive</u>

consequences of paying.  Any suggestion by Gold that making a payment would not

have improved a debtor's credit score contravenes the reasoning of these cases and

---

offering to "amend your credit report" did not violate § 1692e of the FDCPA); *Hogan v. MKM Acquisitions, LLC*, 241 F. Supp. 2d 896, 898 (N.D. Ill. 2003) (letter offering to "improve" consumer's credit rating did not violate FDCPA:  "Even an unsophisticated debtor should realize that the fewer delinquent notices on one's credit report, the better one's credit rating will be."); *Jones v. CBE Group, Inc.*, 215 F.R.D. 558, 566 (D. Minn. 2003) ("Adverse credit reporting is one of the debt collector's most important inducements to prompt payment.  But the opportunity to avoid a negative credit report is also a significant benefit to debtors."); *Hapin v. Arrow Fin. Servs.*, 428 F. Supp. 2d 1057, 1062 (N.D. Cal. 2006) (letter "correctly informed" debtors that "paying their obligations might 'help regain [their] financial future'" and did not violate FDCPA); *Kimmel v. Cavalry Portfolio Servs., LLC*, 2011 WL 3204841, *7 (E.D. Pa. July 28, 2011) (letter stating that payment would help debtor get back on road to financial recovery did not violate FDCPA:  "It is clear that Defendant's comments about improving Plaintiff's financial situation merely underscored the fact that if Plaintiff accepted Defendant's settlement offer, the debt associated with his Bank of America account would be eliminated. There is nothing deceptive about this statement."); *Hartley v. Suburban Radiologic*, 295 F.R.D. 357, 375 (D. Minn. 2013) (letter stating that alternatives available to collector "should you not clear this obligation may include damage to your credit rating" was "an accurate statement of the possible outcomes of failing to respond" to letter); *Erickson v. Performant Recovery, Inc.*, 2013 WL 3223367, *5 (D. Minn. June 25, 2013) (statement that debtor's credit "was so ruined by this debt that" the debtor "couldn't even buy an apple" not actionable under FDCPA: "Simply expressing an opinion about someone's credit score as a consequence of unpaid debts is not material to the collection of the debt."); *Ross v. CNAC*, 2014 WL 1092082, *5 (W.D.N.C. Mar. 17, 2014) (rejecting borrower's claim that lender defamed him by reporting amount financed; "Accurately reporting to a credit agency that a party paid off the amount he financed cannot – as a matter of law – injure the creditor's [sic] reputation.  Indeed the court takes notice that it is precisely the type of information that helps a consumer improve their credit score.").

1    should be disregarded.[16]

2       **iv. Gold's Claim Also Fails Because The Response To The Letter**
3         **Was Handled By Her FDCPA Counsel**

4       Gold relied on her regular FDCPA counsel, Mr. Schwinn, to formulate her

5    response to the letter, and for this reason she does not even have a valid FDCPA

6    claim.  Between August 2010 and April 2012, Gold retained Mr. Schwinn as her

7    "regular lawyer" to handle all of her collection-related matters, including the defense

8    of no less than three debt collection lawsuits filed against her, and the prosecution of

9    three federal FDCPA actions filed against other collectors.  *See* MSS, at Issue 2, Fact

10    1.  When Gold received the May 3, 2012 letter from MCM, she immediately turned it

11    over to Mr. Schwinn for handling.  *See id.* at Issue 2, Fact 2.  She decided what her

12    response would be based upon the advice she received from him.  *See id.* at Issue 2,

13    Facts 3, 4.  She felt an "intelligent" response to the letter was "that I sent it to an

14    expert to evaluate for me."  *See id.* at Issue 2, Fact 5.

15       Given her continuous representation by Mr. Schwinn, and because he

16    formulated her response to the letter, her FDCPA claim fails.  This is not a situation

17    _____

18      [16]  Arguably, the language used in the letter was nothing more than "puffery,"
19    language designed to create a mood in the reader, not a specific representation.  Courts
20    have routinely approved of the use of such language in letters otherwise subject to the
      FDCPA.  *See, e.g., Gruber v. Creditors' Protection Serv.*, 742 F.3d 271, 275 (7th Cir.
21    2014) (describing statement that "[w]e believe you want to pay your just debt" as "a
22    congenial introduction to the verification notice and is best characterized as 'puffing,
      in the sense of rhetoric designed to create[] a mood"); *Zemeckis v. Global Credit &*
23    *Collection Corp.*, 679 F.3d 632, 636 (7th Cir. 2012) (suggestions to "take action now"
24    and call "today" did not impose deadline that contradicted consumer's right to thirty-day
      validation period and "were not tantamount to a request for payment, nor would an
25    unsophisticated consumer understand them as such"; at worst, statements were puffery);
26    *Taylor v. Cavalry Investment, L.L.C.*, 365 F.3d 572, 575 (7th Cir. 2004) ("'Act now to
      satisfy your debt' is in the nature of puffing, in the sense of rhetoric designed to create
27    a mood rather to convey concrete information or misinformation, . . . as it is perfectly
      obvious to even the dimmest debtor that the debt collector would *very* much like him to
28    pay the amount demanded straight off. . . .").

1  where a debtor receives a letter and retains an attorney after the fact for advice.  Here,

2  Mr. Schwinn was already representing Gold for all collection matters, and the letter

3  was effectively sent to him, not to Gold.  As the Ninth Circuit held in *Guerrero*,

4  where a letter is sent to counsel for a debtor, the FDCPA does not apply.  *See* 499

5  F.3d at 929.  As the Court noted: "The Act was meant to shield debtors from abusive

6  collection practices," but it was not "intended as a sword to be brandished by debtors

7  who have retained counsel – the very debtors least in need of the Act's protections."

8  *Id.* at 941.  Gold should not be allowed to brandish the sword here.  Gold's situation

9  is no different than *Guerrero* because a consumer does not need the protections of the

10  FDCPA where the consumer has an experienced FDCPA lawyer on retainer, and that

11  lawyer shields the consumer by formulating a response to the letter.  Gold has no

12  valid FDCPA claim.  Summary judgment is proper.

13  **IV.  <u>CONCLUSION</u>**

14      For each of the forgoing reasons, Defendants respectfully request that the Court

15  enter an Order granting summary judgment for Defendants on all claims.

16

17  DATED:  October 30, 2014          SIMMONDS & NARITA LLP
                                     TOMIO B. NARITA
18                                   JEFFREY A. TOPOR
                                     LIANA MAYILYAN
19

20                                   By:   s/Jeffrey A. Topor
21                                        Jeffrey A. Topor
                                          Attorneys for Defendants
22                                        Midland Credit Management, Inc.
                                          and Midland Funding, LLC
23

24

25

26

27

28